Jason Mark MARGULIES, By and Through his Guardian ad Litem, David K. MARGULIES; David K. Margulies; and Janet C. Margulies, Plaintiffs, Respondents, and Cross-Appellants,

v.

John J. UPCHURCH, M.D.; Carl T. Woolsey, Jr., M.D.; Dan L. Chichester, M.D.; Ob-Gyn Associates, Inc., a Utah professional corporation; St. Mark's Hospital, a Utah corporation; and Dennis L. Morris, M.D., Defendants, Appellants, and Cross-Respondents,

v.

THIRD JUDICIAL DISTRICT COURT In and For SALT LAKE COUNTY, State of Utah, and The Honorable Dean E. Conder, District Judge, Respondents.

John J. UPCHURCH, M.D., Plaintiff,

v.

THIRD JUDICIAL DISTRICT COURT and The Honorable Dean E. Conder, District Judge, Defendants.

Jason Mark MARGULIES, etc., Plaintiffs and Cross-Appellants,

v.

John J. UPCHURCH, et al.; St. Mark's Hospital, a Utah corporation, Defendants, Appellant, and Cross-Respondents,

v.

THIRD JUDICIAL DISTRICT COURT and The Honorable Dean E. Conder, District Judge, Respondents.

Nos. 19762, 19763 and 19776.

Supreme Court of Utah.

Jan. 28, 1985.

Elliot J. Williams, David W. Slagle, Salt Lake City, for Morris.

P. Keith Nelson, Salt Lake City, for Upchurch.

Stewart M. Hanson, Jr., Michael W. Homer, Salt Lake City, for Woolsey and Chichester.

Carman E. Kipp, Salt Lake City, for St. Marks.

Donald Holbrook, William B. Bohling, Jeffrey L. Fillerup, Salt Lake City, for Margulies.

David L. Wilkerson, Atty. Gen., for third Dist. Crt.

DURHAM, Justice:

This is an interlocutory appeal, involving consolidated cases, from an order of the district court denying appellants' (Upchurch, Woolsey, and Chichester) motion to disqualify plaintiffs' counsel in the case of *Margulies v. Upchurch.* The plaintiffs have filed a cross-appeal challenging the trial court's findings regarding the existence of a conflict of interest on the part of plaintiffs' counsel. We reverse on the appeal and affirm on the cross-appeal.

The law firm of Jones, Waldo, Holbrook & McDonough ("Jones, Waldo") represents the plaintiffs and cross-appellants Margulies in a major medical malpractice action filed in Third District Court. The defendants in that action include the appellants and cross-respondents Upchurch, Woolsey, Chichester, and St. Mark's Hospital. The complaint alleges negligence resulting in severe disabilities (quadriplegia, blindness, brain damage, and cerebral palsy) in the plaintiff Jason Margulies. The claim is for several million dollars in general and punitive damages, which amounts are likely to be in excess of available insurance coverage.

At the time of the entry of the order appealed from, Jones, Waldo was also involved as counsel in a federal case, *Diversified Energy/Intermountain Capital Private Drilling Fund 1981–A v. First City National Bank of Midland,* No. C84–0041A (D. Utah filed Jan. 17, 1984) (hereinafter cited as *"Diversified "*). In that case, Jones, Waldo represented the plaintiff Diversified Energy/Intermountain Capital Private Drilling Fund 1981–A ("Diversified Energy"), a Utah limited partnership with nineteen limited partners. Appellants Woolsey and Chichester are limited partners of Diversified Energy. Appellant Upchurch is a stockholder, former officer, and director of Intermountain Capital, a corporation that is co-general partner in Diversified Energy.

In order to become limited partners, Upchurch, Chichester, and Woolsey were all required to submit "suitability" forms outlining their personal financial status and investment experience to Diversified Energy. They were also required to purchase units in Diversified Energy by paying twenty percent of the value of the units in cash and financing the remaining eighty percent by obtaining individual, personal letters of credit. Those letters of credit were subsequently pledged by Diversified Energy to First City National Bank of Midland ("Midland"). Appellant Upchurch, in addition to the above-described participation, also provided Intermountain Capital with personal financial statements and co-signed on lines of credit for the corporation from Midland.

The Margulies' malpractice action was filed in October 1982 and was scheduled for trial in March 1984. In approximately September 1983, David Sundstrom, a co-general partner (along with Intermountain Capital, of which he was president) of Diversified Energy, retained Jones, Waldo as counsel for the partnership. Jones, Waldo informed Sundstrom of the pending medical malpractice suit against three of Diversified's limited partners and requested that Sundstrom attempt to acquire the three limited partners' written consent to Jones, Waldo's representation of Diversified Energy in a lawsuit against Midland. The *Diversified* litigation was aimed at preventing foreclosure on the individual letters of credit.

Sundstrom discussed the proposed representation with the appellants Woolsey and Upchurch, but failed to acquire their written consent. Chichester was not contacted at all, and he and Woolsey were apparently never informed of the nature and ethical implications of the potential conflict of interest. Upchurch discussed the problem with his individual counsel in the malpractice action and, after being told about the significance of the conflict, declined to consent to Jones, Waldo's undertaking the *Diversified* litigation. The uncontroverted facts appear to establish that the appellants neither consented to the representation nor affirmatively objected to it at this

stage.[1] It is also established that Jones, Waldo never discussed the problem with any of appellants' individual counsel in the malpractice action.

Jones, Waldo filed a complaint in the *Diversified* case in January 1984. During that same month, the trial court entered an order in the malpractice action regarding discovery efforts by Jones, Waldo, on behalf of the plaintiffs, to obtain detailed information regarding Upchurch's personal and professional finances. Upchurch, upon learning that Jones, Waldo had not withdrawn from either lawsuit, contacted his lawyer, and a motion was made to have the firm disqualified in the *Margulies* case.

After hearing the motion for disqualification, the trial court prepared a memorandum decision in which it found that: (1) for all practical purposes, the appellants are parties in the *Diversified* litigation; (2) Jones, Waldo had a conflict of interest in violation of the Utah Rules of Professional Conduct in undertaking its representation in both cases; (3) there was "no willful nor intentional violation of [the] standards" in the rules by Jones, Waldo; and (4) there was not full disclosure to the appellants of the possible effect of the representation on the exercise of Jones, Waldo's professional judgment, as required by Utah Code of Professional Responsibility DR 5–105(C) (1977) and, therefore, any consent to or acquiescence in the representation did not satisfy the rule's requirement regarding exceptions. Further finding that "great inconvenience and problems of delay" would be imposed on the plaintiffs by Jones, Waldo's withdrawal from the malpractice case, the court gave the firm the alternative option of withdrawing from the *Diversified* case in federal court and submitting to an order prohibiting them from using in the *Margulies* case any information "gained or available" in connection with the federal court action. The court also found that "in addition to the ethical considerations ..., there is a direct conflict in that in this action the plaintiffs have sought the financial statements of these defendants which was denied by the court but now the access to these very statements is [inherently] included in the federal case." Jones, Waldo withdrew from the federal actions, and an order was subsequently entered as outlined above.

 There being relatively few reported decisions from this Court regarding the principles applicable to professional conduct, we look initially to standards of review articulated in other jurisdictions under similar rules of conduct. Trial courts are usually given broad discretion in controlling the conduct of attorneys in matters before the court, *Redd v. Shell Oil Co.*, 518 F.2d 311, 314 (10th Cir.1975); their discretion extends to deciding whether disqualification is a proper sanction after a finding of an ethical violation, *W.T. Grant Co. v. Haines*, 531 F.2d 671, 676 (2d Cir.1976). Some appellate courts, however, have undertaken review without deference to the trial court on the ground that the interpretation of the ethical rules governing the legal profession involves substantial legal questions. *Unified Sewerage Agency v. Jelco Inc.*, 646 F.2d 1339, 1344 n. 3 (9th Cir.1981); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1088 (3d Cir.1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976); *American Roller Co. v. Budinger*, 513 F.2d 982, 985 n. 3 (3d Cir.

---

1. The affidavits submitted below show a conflict in the evidence respecting the consent question. Sundstrom's statement says: "Dr. Upchurch, based upon my personal conversations with him not only knew about the Firm's representation but consented to as well as paid for the Firm's representation of the Partnership." Upchurch stated that, after Sundstrom asked him to sign a letter of consent, he consulted with his attorney and was advised that a conflict existed and that he should not sign. No one talked directly to Chichester about this question.

The following facts, however, appear to be undisputed: first, none of the appellants affirmatively objected to the representation; second, no one from the partnership or Jones, Waldo disclosed or explained to them the possible effects of the representation or the ethical position of Jones, Waldo; and finally, no one from Jones, Waldo ever discussed the matter at all with any of the appellants before deciding to proceed.

1975). We believe that the trial court's findings in the instant case generally involve mixed questions of fact and law which, on review, do not require the deference due to findings on questions of pure fact. However, the proper standard of review of that portion of the trial court's order which allowed Jones, Waldo to remain as counsel in the malpractice action is the abuse of discretion standard. *See Central Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988, 991 (8th Cir.1978); (*W.T. Grant Co. v. Haines*, 531 F.2d at 676; *Bicas v. Superior Court*, 116 Ariz. 69, 69, 567 P.2d 1198, 1198 (Ariz. Ct.App.1977).

The record here adequately supports, and we agree with, the trial court's findings that an attorney-client relationship existed between Jones, Waldo and the appellants; that Jones, Waldo's concurrent representation of the doctors and the Margulies family created a conflict of interest; and that Jones, Waldo did not fully disclose the nature and possible effects of its concurrent representation to the appellants. Furthermore, under the circumstances of this case, we are persuaded that the trial court's order permitting Jones, Waldo to continue representing the Margulieses constituted an abuse of discretion.

Unless an attorney-client relationship or some fiduciary duty existed between Jones, Waldo and the appellants, there could be no conflict of interest created by the firm's representation of the Margulieses in their malpractice suit. The lower court found that an attorney-client relationship did in fact exist because the federal action, if successful, would directly aid and benefit Upchurch, Woolsey, and Chichester. We agree.

▪ Jones, Waldo contends that a personal request for legal services or advice by the client and an acceptance by the attorney is necessary for an attorney-client relationship to be formed. We disagree. Even in the absence of an express attorney-client relationship, circumstances may give rise to an implied professional relationship or a fiduciary duty toward the client, thereby invoking the ethical mandates governing the practice of law. *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319–20 (7th Cir.1978), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). In a situation similar to this one, a federal district court implied a professional relationship where an officer of a corporation reasonably believed that an attorney had represented him although the attorney disclaimed any such relationship. *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 387–92 (S.D.Tex.1971). Jones, Waldo's successful representation of the limited partnership in *Diversified* would have protected the appellants from substantial personal liability. Therefore, it was not at all unreasonable for the limited partners to believe that Jones, Waldo was acting for their individual interests as well as the interests of the partnership in that litigation. All three of the appellants attested that this was their impression and belief. Jones, Waldo's efforts, although limited, to notify appellants of the potential conflict of interest indicate that Jones, Waldo also recognized that the appellants might consider the firm to be representing their individual interests. Under these circumstances, actual consent is not necessary, and an attorney-client relationship or fiduciary duty may be implied. *See E.F. Hutton*, 305 F.Supp. at 387–92.

▪ It should be noted that we do not find that an attorney automatically becomes counsel for limited partners when he or she undertakes representation of a limited partnership. Ethical Consideration 5–18 of the Utah Code of Professional Responsibility (1977) states that an attorney representing a corporation or similar entity owes allegiance to the entity rather than to its shareholders. A limited partnership is an entity equivalent to a corporation for litigation purposes, *Wall Investment Co. v. Garden Gate Distributing, Inc.*, Utah, 593 P.2d 542, 544 (1979), and therefore representation of a limited partnership does not of itself require allegiance to the interests of the limited partners. If the limited partners stand to gain nothing more from the

attorney's representation of the limited partnership than the incidental gain which will accrue to them as partners, and not in their individual capacities, no attorney-client relationship should be implied. When, however, the individual interests of the limited partners are directly involved, as they are here, there may be sufficient grounds for implying the existence of an attorney-client relationship.[2]

Jones, Waldo argues that its representation in the federal action could neither benefit nor harm the appellants because the letters of credit pledged to Midland were obtained by appellants to finance eighty percent of their individual capital contributions to the limited partnership in lieu of cash. Because the limited partners would remain liable to the partnership for the value of the letters of credit even if Jones, Waldo succeeded in blocking Midland's execution on the note, any benefit realized would come from the renewed financial health of the partnership rather than from any individual benefit. This argument ignores the potential personal liability of the limited partners to Midland should the federal action be unsuccessful. The loan agreement between the partnership and Midland expressly makes the limited partners personally liable to Midland up to the amount of their individual letters of credit. Similarly, pursuant to assumption agreements signed by appellants, the limited partners were liable for the partnership's indebtedness up to the face value of their letters of credit. These documents demonstrate that the limited partners would benefit directly from Jones, Waldo's efforts to prevent Midland from collecting on the obligation. The fact that the partnership might at some future date utilize the letters of credit in some other transaction does not reduce the direct benefit the limited partners would receive by being freed from possible personal liability to Midland.

Under these circumstances, Jones, Waldo's representation of the limited partner-

ship in the federal action gave rise to an attorney-client relationship between the firm and appellants, with a consequent obligation to conform to all applicable standards of professional behavior. We, therefore, uphold the district court's finding in this regard.

 Jones, Waldo also argues that appellants should be estopped from objecting to the firm's representation of the Margulieses because of the timing of their motion, or should be deemed to have waived any right to object, based on appellants' consent to the firm's dual representation. Although Jones, Waldo is correct in pointing out that motions to disqualify opposing counsel may be used as a tool to harass and delay the opposition, such is not the case here. There is no basis in the record for the contention that appellants acted in bad faith in this case. The initial motion to disqualify was made shortly after the federal action was filed (and more than a month before trial of the malpractice action was to commence), the first time that the full dimensions of the conflict of interest became action. The facts here are not comparable to those in *Redd v. Shell Oil Co.*, 518 F.2d 311 (10th Cir.1975), where the motion to disqualify was not filed until the Friday afternoon before a Monday trial, although the information upon which the motion was based had been known for five months. Further, the appellants cannot be presumed to have waived the right to object based on their alleged consent when adequate disclosure of the effects of Jones, Waldo's representation was not made.

In finding that conflict of interest existed by reason of Jones, Waldo's concurrent representation of the appellants and the Margulies family, the trial court noted: "The law has long recognized that an attorney is held to the highest duty of fidelity, honor, fair dealing and full disclosure to a client." We believe that the trial court's

---

2. See *In re Banks*, 283 Or. 459, 471, 584 P.2d 284, 290 (1978), where the Oregon Supreme Court found that an attorney who was representing a closely held corporation was in fact representing both the corporation and its dominant shareholder because the interests of both were at stake.

language is an excellent summary of the obligations imposed on counsel by the Utah Code of Professional Responsibility Canons 4, 5, 9 (1977): the duty to preserve the confidences and secrets of the client, Canon 4; the duty to exercise independent professional judgment on behalf of the client, Canon 5; and the duty to avoid even the appearance of professional impropriety, Canon 9.

### CANONS 4 AND 5

 The appellants contend that Jones, Waldo, as counsel in the federal action, obtained or had access to certain confidential financial information about them which might be used to their detriment in the malpractice action if Jones, Waldo continues to litigate that case. Canon 4's prohibitions against disclosure of client confidences and secrets[3] have generally been interpreted to forbid an attorney from representing a client against a former client in a matter substantially related to the former client's representation. *Trone v. Smith,* 621 F.2d 994, 998–99 (9th Cir.1980); *General Electric Co. v. Valeron Corp.,* 608 F.2d 265, 267 (6th Cir.1979), *cert. denied,* 455 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *United States v. Standard Oil Co.,* 136 F.Supp. 345, 354 (S.D.N.Y.1955). This rule is intended to prevent the possibility that an attorney might use information given in confidence by a former client in a later action against that client. Allowing later adverse representation when the former client's disclosures might be used against him could inhibit the free exchange of information between attorney and client which our legal system presupposes. We would be reluctant, however, to grant disqualification in the instant case solely on the basis of Canon 4. Case law on the degree of congruence necessary for two cases to be considered "substantially related" varies widely. *Compare Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739–40 (2d Cir.1978) (disqualification granted only when issues identical or es-

sentially the same) *with Melamed v. ITT Continental Baking Co.,* 592 F.2d 290, 292 (6th Cir.1979) (matters embraced within suit need only be substantially related). There is in this case a dispute about the extent and confidential nature of information Jones, Waldo actually obtained by virtue of its employment in the federal action. Although the facts and issues involved may be so related that an attorney or firm will clearly be precluded from undertaking representation against a former client, the inevitable frequency with which large and departmentalized law firms will be asked to litigate against former clients suggests that disqualification pursuant to Canon 4 should not be granted lightly. We are not persuaded, however, by Jones, Waldo's argument that the financial information in question relates only to the prayer for punitive damages in the *Margulies* action and is, therefore, not relevant until after a demonstration of a basis for a punitive award. Even though it is true that Jones, Waldo could legitimately acquire such personal financial information on behalf of the Marguliesses if there is a prima facie showing of grounds for punitive damages at trial, the premature possession of such information could well have substantial impact on settlement proposals and discussions and on trial strategy.

 We believe, however, that this case is more easily resolved by considering, in conjunction with the Canon 4 problems, Canon 5. Disciplinary Rule 5–105 of the Code concerns situations where an attorney is representing two adverse clients simultaneously, rather than representing a current client against a former client. Although Jones, Waldo has discontinued its representation in *Diversified* as a condition to being allowed to continue in the *Margulies* action, Jones, Waldo was counsel in both actions at the time the disqualification motion was filed. It is our strong view that an attorney who is simultaneously representing two clients with differing interests

---

**3.** Utah Code of Professional Responsibility DR 4–101 (1977) forbids an attorney from using a confidence or secret of a client to the disadvantage of the client and bans revealing the information unless the client consents after full disclosure.

should not be able to avoid conforming to Canon 5 by simply dropping one of the clients at his option when a disqualification motion is filed. *See Unified Sewerage Agency v. Jelco Inc.,* 646 F.2d 1339, 1345 n. 4 (9th Cir.1981); *see also Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 435 F.Supp. 84, 95 (S.D.N.Y.1977), *aff'd in part, rev'd in part on other grounds,* 567 F.2d 225 (2d Cir.1977). Otherwise, little incentive would exist for attorneys to avoid dual employment by adverse parties in the first place. Jones, Waldo's continued representation of the Margulieses must be judged by the standards applicable at the time the trial court's order was made, namely, at the time the firm was simultaneously representing appellants in the federal action.

Disciplinary Rule 5–105 of the Utah Code of Professional Responsibility states in part:

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients *if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.*

(Emphasis added.) The first requirement of DR 5–105(C) is that it be "obvious" that the attorney be able to represent both clients adequately. Although adverse representation in itself might not frustrate fulfillment of this requirement, Jones, Waldo's receipt of financial information regarding the appellants' direct interests in the federal action should have raised some doubt in the minds of firm members as to the propriety of undertaking the federal action. At the very least, one has to wonder about the trust and confidence a physician will be able to repose in an attorney whose partners and associates are suing him for professional malpractice. The evidence before the trial court in this case demonstrated that Jones, Waldo was in fact aware that a conflict of interest problem did exist. The readily apparent nature of the problem indicates that it was not "obvious" that the firm could represent both clients adequately. *See* DR 5–105(C); *cf. Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976) (burden on firm to show that adverse representation not harmful).

▆▆▆▆ The second requirement of DR 5–105(C) is that the attorney obtain consent to the dual representation after *"full disclosure of the possible effect* of such representation." (Emphasis added.) The burden of showing full disclosure rests upon the attorney undertaking adverse employment. *In re Hansen,* Utah, 586 P.2d 413, 415 (1978).[4] Jones, Waldo contends that it obtained the requisite consent because it disclosed its relationship with the Margulies family to Sundstrom, the general partner in Diversified Energy, and to Ralston, the limited partner named as a party in the federal action. Jones, Waldo relies on the fact that the limited partnership gave its consent through Sundstrom and on the assertion that all the physicians expressly consented to the firm's representation of the limited partnership. Although there is a dispute about the details of appellants' alleged consent, there is no dispute about the fact that Jones, Waldo did not undertake "full disclosure of the possible effect of [the] representation on the exercise of [its] independent professional judgment on behalf of [appellants]," as required by the rule. DR 5–105(C). For client consent to be adequate in a conflict of interest situation, the attorney must not only inform

---

4. *Hansen* appears to presume that any conflicting representation has the "adverse effect" required by DR 5–105(B) to invoke DR 5–105(C), as the subject matter of the two suits involved in *Hansen* was unrelated. *Id.* at 414; *accord I.B.M. v. Levin,* 579 F.2d 271, 280 (3d Cir.1978); *Unified Sewerage Agency,* 646 F.2d at 1351.

both parties that he is undertaking to represent them, but must also explain the nature and implications of the conflict in enough detail so that the parties can understand why independent counsel may be desirable. *In re Boivin*, 271 Or. 419, 424, 533 P.2d 171, 174 (1975). No attorneys from Jones, Waldo spoke with appellants about the possible conflict of interest; instead, the firm requested a layman, Sundstrom, to pass on the information and required no adequate assurances that he had done so properly. Reliance on a lay person is simply not sufficient to meet the standard of professional conduct. Sundstrom could not be supposed to understand the nuances of the ethical requirements of the situation and the alternatives available to the appellants. It does not even appear that he understood Jones, Waldo's dual representation to be possibly unethical. Nor can the fact that appellants paid a pro rata share of the limited partnership's legal fees to the firm vitiate the lack of full disclosure.

Although the trial court found that the requirements of DR 5–105(C) were not met, it allowed Jones, Waldo to continue as counsel for the Margulies family if the firm agreed to withdraw as counsel in the federal action and also agreed not to use any information obtained in the federal action. We believe that the trial court abused its discretion by not requiring Jones, Waldo to withdraw from employment in the malpractice case. Jones, Waldo's failure to comply with the standards set forth in Canon 5 may not be cured or rectified by an optional withdrawal in the case of its choice, for reasons we discuss hereafter.

## CANON 9

 Motions to disqualify opposing counsel present the court with two important but often opposing policy considerations: on the one hand, the undesirability of separating litigants from the counsel of their choice and, on the other, the necessity of ensuring that litigants and the public perceive lawyers and courts as possessing the integrity necessary for the disposition of justice. We are especially mindful of the latter consideration, as this Court is charged by law with approving and administering rules of conduct and discipline governing the practice of law in the State of Utah. U.C.A., 1953, §§ 78–51–14, –19 (1977). Among the guidelines for professional conduct which we have approved is Canon 9, which states: "A lawyer should avoid even the appearance of professional impropriety." The basis of this tenet is that society's perception of the integrity of our legal system may be as important as the reality, since it is the perception that engenders public confidence that justice will be dispensed. Litigants are highly unlikely to be able to maintain this confidence if their attorney in one matter is allowed simultaneously to sue them in another. As this Court said in another case involving an attorney representing two adverse parties concurrently:

> The practice of law is a profession whose members are granted a special privilege of holding themselves out as having the education, the skills and the integrity to give help and guidance to others in their affairs.... This includes that the attorney will become unreservedly identified with his client's interests and protect his rights. It means not only in dealing with the client's adversary, but also that the attorney will adhere to the ideals of honesty and fidelity with the client himself; and that he will not use his position to take any unfair advantage of the special confidence which the client is entitled to repose in him.

*In re Hansen*, Utah, 586 P.2d 413, 416 (1978). Although *Hansen* was a disciplinary action rather than a disqualification motion, the principle that an attorney should become identified solely with the rights of his client and not use, or appear to use, his position to take advantage of his client's confidence in him is nonetheless valid here. We recognize that disqualification motions based on very slight appearances of impropriety have been misused for tactical advantage in litigation. *See Alexander v. Superior Court*, 141 Ariz. 157, 685 P.2d 1309, 1317 (1984). In this case,

however, a serious appearance of impropriety is coupled with violations of the Code of Professional Responsibility which in and of themselves call for disqualification. The integrity of the court system as well as the integrity of the profession requires that Jones, Waldo withdraw from the malpractice action. We are aware that considerable hardship is thereby imposed on the Margulies family, the resolution of whose claim has been delayed by this unfortunate problem. We are hopeful, however, that the advanced state of discovery in their action and the availability of other counsel skilled in medical malpractice litigation in our bar will allow the case to proceed to trial relatively quickly. We urge the assistance of the district court in that regard. That portion of the order of the trial court allowing Jones, Waldo to remain as counsel in the malpractice action is reversed. The remainder of the order is affirmed.

HALL, C.J., and STEWART and HOWE, JJ., concur.

ZIMMERMAN, J., does not participate herein.